AO 106 (Rev. 04/10) Application for a Search Warrant



# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| the property located at | ) Case No. 2:19-MJ-04172 |
| 1224 West Martin Luther King Jr. Blvd | ) |
| Los Angeles, California 90037 | ) |
| ("SUBJECT PREMISES") | ) |

**FILED**
CLERK, U.S. DISTRICT COURT

OCT – 2 2019

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 846 | Conspiracy to Distribute and Possess with Intent to |
| 18 U.S.C. §§ 922(g)(1), 924(c) | Distribute Controlled Substances; Possession of a Firearm in Furtherance of Drug Trafficking; Felon in Possession of a Firearm and Ammunition |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

DEA TFO Giovanni Lampignano
*Printed name and title*

Sworn to before me and signed in my presence.

Date: Oct. 2, 2019

_____
*Judge's signature*

City and state:  Los Angeles, CA

MARIA A. AUDERO, US MAGISTRATE JUDGE
*Printed name and title*

AUSA: Diaz x0302

**AFFIDAVIT**

I, Giovanni Lampignano, being duly sworn, declare and state as follows:

## I.   PURPOSE OF AFFIDAVIT

1.      This affidavit is made in support of a warrant to search the premises located at 1224 West Martin Luther King Jr. Blvd, Los Angeles, California 90037 (the "SUBJECT PREMISES"), more fully described in Attachment A, incorporated herein by reference, for evidence, fruits and instrumentalities of violations of Title 21 United States Code, Sections 846 and 841(a)(1) (conspiracy, distribution, and possession with intent to distribute controlled substances), and Title 21 United States Code, Sections 922(g)(1) and 924(c) (felon in possession of a firearm and possession of a firearm in furtherance of drug trafficking) (the "Target Offenses"), as described further in Attachment B, which is also incorporated by reference.

2.      The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.   INTRODUCTION

3.      I am a law enforcement officer of the United States, within the meaning of Title 18, United States Code, Section 2510(7), and I am empowered by law to conduct investigations of, and to make arrests for, the offenses enumerated in Title 18, United States Code, Section 2516.

4.      I am a sworn Task Force Officer ("TFO") for the Drug Enforcement Administration ("DEA").  I am also a Detective with the Los Angeles County Sheriff's Department ("LASD") and have been so employed since September 2006.  I am currently assigned to the Los Angeles Division, Southern California Drug Task Force/High Intensity Drug Trafficking Area ("HIDTA").  HIDTA is currently comprised of agents, officers and

1

investigators, including but not limited to, from the DEA, the Federal Bureau of Investigations ("FBI"), the Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), LASD, the Los Angeles Police Department ("LAPD").

5.      During my employment with LASD, I have attended numerous hours of training on the subject of gang activity and gang membership.  I frequently exchange information with other detectives and gang investigators throughout California.  I have worked on hundreds of gang and non-gang related investigations, and have made hundreds of arrests in the course of those investigations.  I have talked with and interrogated hundreds of gang members, criminal suspects, witnesses and victims while working as a patrol deputy and gang investigator.  The crimes I have investigated include, but are not limited to, murder, assaults, theft, possession of stolen property, sales of controlled substances, possession of illegal firearms/weapons, and vandalism.  I have become familiar with various gangs, their lifestyles, alliances, rivalries, membership and means of identification (including tattoos and graffiti).  I have also testified numerous times as a gang expert in the Los Angeles Superior Court.

6.      In early March 2017, LASD and the DEA began investigating the "Rollin' 30s Harlem Crips" (hereinafter, "Rollin' 30s").  This investigation has resulted in a number of indictments.  On August 14, 2019, a Federal Grand Jury returned an indictment in United States v. Angelo Gabriel Reed, et al., Case Number 19-CR-462-SVW, charging the following fourteen "Rollin' 30s Harlem Crips" criminal street gang ("Rollin' 30s") members and associates: ANGELO GABRIEL REED, also known as ("aka") "Maniac" and "Yacc" ("REED"), CHRISTOPHER CRUZ, aka "Tutu" ("CRUZ"), RODERICK FORD, aka "Payme" ("FORD"), JUAN VALENCIA CONTRERAS, aka "Rascal" ("CONTRERAS"), DARREL DAMONT SUMLER, aka "Chapo" ("SUMLER"), JAMAD VASHER, aka "Jamal" ("VASHER"), CHRISTIAN COBB, aka "Stone" ("COBB"), NATALIE JONES, aka "Nat" ("JONES"), MARCUS EGARTON, aka "Shark" ("EGARTON"), LANISHA JENKINS, aka "Nene" ("JENKINS"), LORIEL BROWN, aka "Lori" ("BROWN"), KENNETH BOYD, aka "Monster

2

Ken" ("BOYD"), MARTEL PERRYMAN, aka "Marty" ("PERRYMAN"), and ANDREA UNDERWOOD, aka "Coco" ("UNDERWOOD"), and others known and unknown, (collectively, the "REED DEFENDANTS") with conspiracy to manufacture, distribute, and possess with intent to distribute, cocaine base in the form of crack cocaine, as well as other narcotics charges (the "Reed Indictment").

7.      On August 14, 2019, a Federal Grand Jury returned an indictment in <u>United States v. Juan Valencia Contreras, et al.</u>, Case Number 19-CR-464-SVW, charging the following three individuals: JUAN VALENCIA CONTRERAS, aka "Rascal" ("CONTRERAS"), ESMERELDA CUEVAS ("CUEVAS"), and JERRY RAMOS, aka "Pelon" ("RAMOS"), (collectively, the "CONTRERAS DEFENDANTS") with conspiracy to distribute and possess with intent to distribute heroin, cocaine, methamphetamine, and fentanyl (the "Contreras Indictment").

8.      The REED DEFENDANTS and the CONTRERAS DEFENDANTS will collectively be referred to as the "Target Subjects."

### III.  SUMMARY OF PROBABLE CAUSE

9.      On October 2, 2019, investigators executed multiple search and arrest warrants at residences associated with the Target Subjects, including a search warrant for the SUBJECT PREMISES that authorized law enforcement to enter the SUBJECT PREMISES to arrest CONTRERAS and CUEVAS.

10.     During a protective sweep of the SUBJECT PREMISES, LASD Detective Noelle Judge saw, in plain view on top of a pile of clothes, a black bulletproof vest.  During the arrest and transport of CONTRERAS and CUEVAS, Detective Judge observed behavior from both CONTRERAS and CUEVAS that was consistent with having drugs secreted in their anal cavities.

### IV.  STATEMENT OF PROBABLE CAUSE

11.     Based on my review of reports and discussions with fellow law enforcement officers, as well as my personal involvement in this investigation, I know the following:

3

A.     **Summary and Background of Investigation**

12.     Rollin' 30s is a criminal street gang in the Los Angeles area with over five hundred documented members. Rollin' 30s claim the territory between Martin Luther King Boulevard to the South, Adams Boulevard to the North, Normandie Avenue to the East and Crenshaw Boulevard to the West. Rollin' 30s is also known to have members migrate to the Antelope Valley area where they engage in criminal activity. Through this investigation and from years of working in the Los Angeles area, I know that Rollin' 30s members and associates have engaged in a pattern of criminal and violent activities to include drug sales, robberies, shootings, assaults, and murders in the Los Angeles County area.

13.     During the course of the instant investigation, through recorded jail calls, LASD and DEA investigators learned that Rollin' 30s member REED operated a drug trafficking organization involving BROWN and the REED DEFENDANTS as well as other identified and unidentified individuals as suppliers, manufacturers, couriers, street level drug dealers, and enforcers. Investigators deployed a Confidential Human Source ("CHS") to make contact with REED in recorded consensual calls, and heard REED agree to supply cocaine and methamphetamine to the CHS.

14.     The investigation in this matter has to date included surveillance of the Target Subjects and other members and associates, pole cameras facing public locations where the Target Subjects conduct their illegal drug business, as well Title III interception of wire and oral communications over the telephone lines of certain Target Subjects. Through these interceptions, law enforcement has heard and read about the REED DEFENDANTS discussing obtaining, manufacturing, packaging, and distributing drugs, collecting drug proceeds, and enforcing drug debts. Further, on numerous occasions throughout the investigation, law enforcement has seen many of the REED DEFENDANTS conduct hand-to-hand exchanges with crack cocaine customers throughout the Rollin' 30s' claimed territory in Los Angeles, California, and seized crack cocaine from customers of the REED DEFENDANTS. Law enforcement has also seen REED meet in person with CONTRERAS to conduct suspected drug deals.

Investigators identified CONTRERAS as one of REED's cocaine suppliers, and learned the
CONTRERAS operated his own drug trafficking organization with the CONTRERAS
DEFENDANTS, supplying large quantities of narcotics to REED and many others.  Title III
interceptions also captured the CONTRERAS DEFENDANTS discussing obtaining and selling
large quantities of heroin, cocaine, methamphetamine, and fentanyl.

**B.      The Indictments & Warrants**

15.      As discussed above, on August 14, 2019, a Federal Grand Jury returned
indictments against the REED DEFENDANTS and the CONTRERAS DEFENDANTS.  On that
date, the Honorable John McDermott, United States Magistrate Judge, issued arrest warrants for
the REED DEFENDANTS and the CONTRERAS DEFENDANTS.

16.      On September 27, 2019, the Honorable Rozella A. Oliver, issued twelve search
warrants: four to search locations for evidence and Target Subjects; and eight to search locations
for Target Subjects alone, including the SUBJECT PREMISES.  These search warrants were
executed simultaneously in the early morning hours on October 2, 2019, in a coordinated
takedown operation.

**C.      CONTRERAS' and CUEVAS' Roles in the Indictments**

17.      CONTRERAS is a Hispanic male with a date of birth of November 25, 1983.  He
is an indicted co-conspirator in both the Reed Indictment and the Contreras Indictment, and a
warrant has been issued for his arrest.  Based on my review of the evidence collected in this
investigation, I know that CONTRERAS supplied powder cocaine to REED, and also separately
obtained and distributed large quantities of heroin, cocaine, methamphetamine, and fentanyl to
unidentified customers, and that CONTRERAS and CUEVAS are in a romantic relationship and
reside together.  CONTRERAS is a convicted felon with convictions for possession of
contraband in jail (2012), assault with a semi-automatic firearm (2009), domestic violence
(2008), receipt of stolen property (2007), and carrying a loaded firearm in public (2004).

18.      CUEVAS is a Hispanic female with a date of birth of May 7, 1988.  She is an
indicted co-conspirator in one of the sealed indictments, and a warrant has been issued for her

arrest. Based on my review of the evidence collected in this investigation, I know that CUEVAS is actively involved in obtaining and distributing drugs, including methamphetamine, with CONTRERAS.

### D. Search of the SUBJECT PREMISES

19. I have spoken to LASD Detective Noelle Judge and learned the following:

a. On October 2, 2019, at approximately 3:30 a.m., pursuant to a search warrant for individuals only, law enforcement officers attempted entry at the SUBJECT PREMISES in order to arrest CONTRERAS and CUEVAS. During officers' attempted entry, they could see CUEVAS through the windows. CUEVAS was shouting "Give me time! Give me time!" During this time, officers saw CUEVAS take off her clothes and wrap herself with a towel.

b. While officers were conducting a protective sweep of the SUBJECT PREMISES, in the bedroom belonging to CONTRERAS and CUEVAS, LASD Detective Noelle Judge picked up a pair of pants for CUEVAS to wear for transport and saw, in plain view, a black bulletproof vest.

c. During her interactions with CUEVAS while helping CUEVAS get dressed, Detective Judge saw CUEVAS moving in a way that made Detective Judge believe that CUEVAS had something secreted in her anal cavity. During the transport of CONTRERAS and CUEVAS in Detective Judge's vehicle, Detective Judge smelled the foul odor of flatulence coming from the back seat, which is consistent with CONTRERAS and/or CUEVAS having secreted contraband in their anal cavities. During transport, CUEVAS made statements indicating that the flatulence was coming from CONTRERAS.

d. Law enforcement officers cleared the SUBJECT PREMISES, arrested CONTRERAS and CUEVAS pursuant to the above-mentioned federal arrest warrants, and "froze" the location pending this application for a search warrant.

20. Based on CONTRERAS' criminal history, including multiple violent and firearms related convictions, CONTRERAS and CUEVAS' conduct in the indictments trafficking in large

6

quantities of controlled substances, coupled with the bulletproof vest found at the SUBJECT PREMISES and the possible smuggling of drugs in their body cavities, I believe that a full search of the SUBJECT PREMISES will lead to additional evidence and fruits of the above-described criminal activity.

## V.   TRAINING AND EXPERIENCE REGARDING THE TARGET OFFENSES

21.   Based on my training, experience, and the collective experiences related to me by other law enforcement agents who specialize in drug-trafficking, firearms, and gang investigations, I know the following:

a.   Drug traffickers often store documents and other items relating to the possession, manufacture, importation, exportation, and distribution of drugs and to the illegal proceeds of drug trafficking. These documents and items include books, receipts, invoices, notes, ledgers, bank records, money orders, and other records relating to the manufacture, possession, and distribution of illegal controlled substances. The aforementioned records are often maintained where the drug trafficker has ready access to them and where they can be concealed from law enforcement, such as the drug traffickers' residences, places of business, cars, and other locations from which the drug trafficker conducts drug business. Such records are also often stored on the drug traffickers' cellular phones, smart phones, and other digital devices.

b.   Drug traffickers commonly store drugs and drug paraphernalia, including packaging materials, cutting agents, and manufacturing tools, in their residences, stash houses, cars, and other locations from which the drug trafficker conducts drug business, where they are readily available and concealed from law enforcement.

c.   Drug traffickers keep books, receipts, notes, ledgers, and other records relating to their drug distribution activities. Because drug traffickers' often "front" drugs to their customers -- that is, sell the drugs on credit -- or receive drugs from their suppliers on credit, such records are necessary to keep track of the amounts paid and owed by/to their customers and suppliers. These ledgers are more commonly known as "pay/owe sheets," and may be as simple

7

as notations on miscellaneous pieces of paper or may be recorded more formally in notebooks or even computer spreadsheets. "Pay/owe sheets" are frequently encoded in order to protect the identities of customers and suppliers. Drug traffickers often keep such records in their residences (even if only intermittently used), stash houses, places of business, and cars. Such records are also often stored on the drug traffickers' cellular phones, smart phones, and other digital devices.

        d.      Drug traffickers commonly keep large sums of currency, financial instruments, precious metals, jewelry, gift cards, and other items of value, which are either the proceeds from drug sales or are intended for the purchase of drugs. When drug traffickers amass such wealth, they often attempt to conceal it and its origin from discovery by law enforcement. Drug traffickers use many different techniques to do so, including using digital currency, and using savings and checking accounts, securities, cashier's checks, money drafts and letters of credit to exchange drug proceeds into money that appears to come from a legitimate source. Drug traffickers also use drug proceeds to purchase real estate or cars, and establish shell corporations and business fronts that they use to launder drug proceeds. Drug traffickers often use fictitious or "straw-holder" owners to conceal the true ownership of real estate, cars, or other valuable items purchased with the proceeds of drug sales. In addition, drug traffickers often use wire transfers, cashier's checks, and money orders to pay for drugs or other costs relating to their distribution activities. Drug traffickers often keep these items of value, and records relating to them, in their residences, stash houses, places of business, and cars, where they are readily available and concealed from law enforcement.

        e.      Drug traffickers go to great lengths to hide and secure the drugs, drug proceeds, other items of value, and records relating to their drug business. This is to safeguard those items against robbery and keep them hidden from law enforcement. Drug traffickers hide these items by storing them in secure locations, including safes, vaults, or other locked containers, as well as in specially-constructed concealed compartments that are often found in cars used for drug trafficking. Other methods of concealment include the burial of items

underground, the use of locked cars, trailers, out buildings, sheds, and exterior closets, the use of natural spaces within walls, furniture, cars, and other areas, and the use of sealed cans and canning machines.

        f.     Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. These persons frequently maintain listings of names, aliases, telephone numbers, physical addresses, and email addresses, sometimes encoded and sometimes not encoded, for the purpose of contacting their suppliers, customers, transporters, and others involved in their illicit drug distribution activities. These records are typically maintained in their residences, stash houses, places of business, and cars, where they are readily available and concealed from law enforcement. Moreover, such records are often stored electronically within the memory of telephones, computers, and personal digital assistants such as iPhone, Blackberry, and other digital devices.

        g.     Drug traffickers often use electronic devices such as cellular telephones, satellite telephones, pagers and text messaging devices, voicemail or answering machine systems, telephone calling cards, computers, email, and personal digital assistants such as iPhone and Blackberry devices in order to communicate with their suppliers, customers, transporters, and others involved in their illicit drug distribution activities. Drug traffickers often keep the documents and records described above on those devices. Drug traffickers often use multiple phones, including not only their own phones but also phones of family members and significant others, in order to avoid detection by law enforcement. Drug traffickers often keep these devices in their residences, stash houses, places of business, and cars, where they are readily available.

        h.     Communications between persons buying and selling controlled substances often occurs by telephone calls and messages, such as e-mail and text messages, sent to and from cellular phones, smart phones, and other digital devices. This includes sending photos of the controlled substances between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring firearms and other weapons to a deal.

i.      Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds. Documents relating to such travel, such as calendars, travel itineraries, maps, airline tickets, baggage stubs, frequent use club membership information, airline, rental car, and hotel receipts, credit card bills, photographs, videos, passports, and visas, are often kept by drug traffickers in their residences, stash houses, places of business, and cars, as well as digital devices, where they are readily available.

j.      Drug traffickers frequently possess firearms, ammunition, silencers, body armor (such as bulletproof vests), and other dangerous weapons to protect their profits and supply of drugs from others who might attempt to forcibly take such items and harm the drug traffickers during transactions.  Such weapons, which are often stolen or otherwise possessed illegally, are typically kept in their residences, stash houses, places of business, and cars, where they are concealed from law enforcement and readily accessible.

k.      Drug traffickers often use two-way radios, police scanners, video surveillance systems, and other counter surveillance equipment to prevent detection by law enforcement.  Such items are typically kept in their residences, stash houses, places of business, and cars.

l.      Drug traffickers frequently take, or cause to be taken, photographs and videos of themselves, their criminal associates, their real and personal property, their weapons, and their drugs.  Such items are often stored in their residences, stash houses, places of business, and cars, and on digital devices.

m.      Persons who possess, purchase, or sell firearms generally maintain the firearms and records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such as a vehicle.  Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their cell phones, smart phones,

computers, and other digital devices. It has been my experience that individuals who purchase

firearms illegally will keep the contact information of the individual who is supplying firearms to

prohibited individuals or other individuals involved in criminal activities for future purchases or

referrals. Many people do not dispose of their firearms-related records; they usually keep their

records for long periods, often spanning several years.

           n.      Correspondence between persons buying and selling firearms often occurs

by e-mail or text message sent to and from smart phones, laptops, or other digital devices. This

includes sending photos of the firearm between the seller and the buyer, as well as negotiation of

price. In my experience, individuals who engage in street sales of firearms frequently use e-mail

and text messages to communicate with each other regarding firearms that they sell or offer for

sale. In addition, it is common for individuals engaging in the unlawful possession or sale of

firearms to have photographs of firearms they or other individuals working with them possess on

their cellular phones and other digital devices as they frequently send these photos to each other

to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

           o.      Gang members often store or maintain items associated with their gang

affiliation in their residences, stash houses, places of business, and cars, as well as on their digital

devices, including photographs, scrapbooks, images of graffiti associated with their gang, and

other objects displaying allegiance to their gang, including posters, drawings, hats or other

apparel bearing gang signs and symbols, rosters, monikers, telephone numbers, and sometimes

detailed notes about discipline, debts owed, and gang members who are not in good standing.

## VI.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES

    22.    As used herein, the term "digital device" includes any electronic system or device

capable of storing or processing data in digital form, including central processing units; desktop,

laptop, notebook, and tablet computers; personal digital assistants; wireless communication

devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital

cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral

input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives

intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

      a.      Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

      b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

      c.      The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises.

      d.      A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes

are now commonplace.  Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

        e.      Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.[1] Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.

        f.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file.  Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.  Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.  Recovery also can require substantial time.

---

[1]     These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

g.      Although some of the records called for by this warrant might be found in
the form of user-generated documents (such as word processing, picture, and movie files), digital
devices can contain other forms of electronic evidence as well.  In particular, records of how a
digital device has been used, what it has been used for, who has used it, and who has been
responsible for creating or maintaining records, documents, programs, applications and materials
contained on the digital devices are, as described further in the attachments, called for by this
warrant.  Those records will not always be found in digital data that is neatly segregable from the
hard drive image as a whole.  Digital data on the hard drive not currently associated with any file
can provide evidence of a file that was once on the hard drive but has since been deleted or
edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word
processing file).  Virtual memory paging systems can leave digital data on the hard drive that
show what tasks and processes on the computer were recently used.  Web browsers, e-mail
programs, and chat programs often store configuration data on the hard drive that can reveal
information such as online nicknames and passwords.  Operating systems can record additional
data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the
times the computer was in use.  Computer file systems can record data about the dates files were
created and the sequence in which they were created.  This data can be evidence of a crime,
indicate the identity of the user of the digital device, or point toward the existence of evidence in
other locations.  Recovery of this data requires specialized tools and a controlled laboratory
environment, and also can require substantial time.

h.      Further, evidence of how a digital device has been used, what it has been
used for, and who has used it, may be the absence of particular data on a digital device.  For
example, to rebut a claim that the owner of a digital device was not responsible for a particular
use because the device was being controlled remotely by malicious software, it may be necessary
to show that malicious software that allows someone else to control the digital device remotely is
not present on the digital device.  Evidence of the absence of particular data on a digital device is
not Segre gable from the digital device.  Analysis of the digital device as a whole to demonstrate

14

the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

        i.      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime. In addition, decryption of devices and data stored thereon is a constantly evolving field, and law enforcement agencies continuously develop or acquire new methods of decryption, even for devices or data that cannot currently be decrypted.

    23.    As discussed herein, based on my training and experience I believe that digital devices will be found during the search, and that they may contain biometric security features.

        a.      I know from my training and experience and my review of publicly available materials that several hardware and software manufacturers offer their users the ability to unlock their devices through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint-recognition, face-recognition, iris-recognition, and retina-recognition. Some devices offer a combination of these biometric features and enable the users of such devices to select which features they would like to utilize.

b.      If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple Inc. ("Apple") offers a feature on some of its phones and laptops called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which on a cell phone is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the phone, and on a laptop is located on the right side of the "Touch Bar" located directly above the keyboard.  Fingerprint-recognition features are increasingly common on modern digital devices.  For example, for Apple products, all iPhone 5S to iPhone 8 models, as well as iPads (5th generation or later), iPad Pro, iPad Air 2, and iPad mini 3 or later, and MacBook Pro laptops with the Touch Bar are all equipped with Touch ID. Motorola, HTC, LG, and Samsung, among other companies, also produce phones with fingerprint sensors to enable biometric unlock by fingerprint.  The fingerprint sensors for these companies have different names but operate similarly to Touch ID.

c.      If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face.  To activate the facial-recognition feature, a user must hold the device in front of his or her face.  The device's camera analyzes and records data based on the user's facial characteristics.  The device is then automatically unlocked if the camera detects a face with characteristics that match those of the registered face.  No physical contact by the user with the digital device is necessary for the unlock, but eye contact with the camera is often essential to the proper functioning of these facial-recognition features; thus, a user must have his or her eyes open during the biometric scan (unless the user previously disabled this requirement).  Several companies produce digital devices equipped with a facial-recognition-unlock feature, and all work in a similar manner with different degrees of sophistication, e.g., Samsung's Galaxy S8 (released Spring 2017) and Note8 (released Fall 2017), Apple's iPhone X (released Fall 2017).  Apple calls its facial-recognition unlock feature

16

"Face ID." The scan and unlock process for Face ID is almost instantaneous, occurring in approximately one second.

        d.      While not as prolific on digital devices as fingerprint- and facial-recognition features, both iris- and retina-scanning features exist for securing devices/data. The human iris, like a fingerprint, contains complex patterns that are unique and stable. Iris-recognition technology uses mathematical pattern-recognition techniques to map the iris using infrared light. Similarly, retina scanning casts infrared light into a person's eye to map the unique variations of a person's retinal blood vessels. A user can register one or both eyes to be used to unlock a device with these features. To activate the feature, the user holds the device in front of his or her face while the device directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data from the person's eyes. The device is then unlocked if the camera detects the registered eye. Both the Samsung Galaxy S8 and Note 8 (discussed above) have iris-recognition features. In addition, Microsoft has a product called "Windows Hello" that provides users with a suite of biometric features including fingerprint-, facial-, and iris-unlock features. Windows Hello has both a software and hardware component, and multiple companies manufacture compatible hardware, e.g., attachable infrared cameras or fingerprint sensors, to enable the Windows Hello features on older devices.

        e.      In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.

        f.      I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features have been enabled. This can occur when a device has been restarted or inactive or has not been unlocked for a certain period of time. For example, with Apple's biometric unlock features,

17

these circumstances include when: (1) more than 48 hours has passed since the last time the device was unlocked; (2) the device has not been unlocked via Touch ID or Face ID in eight hours and the passcode or password has not been entered in the last six days; (3) the device has been turned off or restarted; (4) the device has received a remote lock command; (5) five unsuccessful attempts to unlock the device via Touch ID or Face ID are made; or (6) the user has activated "SOS" mode by rapidly clicking the right side button five times or pressing and holding both the side button and either volume button. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time. I do not know the passcodes of the devices likely to be found during the search.

    g. For these reasons, if while executing the warrant, law enforcement personnel encounter a digital device that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to, with respect to any biometric sensor-enabled device that is (a) located at the SUBJECT PREMISES and (b) falls within the scope of the warrant: (1) compel the use of Target Subjects' thumb- and/or fingerprints on the device(s); and (2) hold the device(s) in front of Target Subjects' face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature. With respect to fingerprint sensor-enabled devices, although I do not know which of the fingers are authorized to access any given device, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for fingerprint sensors; and, in any event, all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

    24. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

# VII. CONCLUSION

25.     For all the reasons described above, there is probable cause to believe that evidence of the Target Offenses, described above and in Attachment B, will be found at the SUBJECT PREMISES, further described above and in Attachment A.


_____
Giovanni Lampignano, Task Force Officer
Drug Enforcement Administration

Subscribed to and sworn before me
this 2nd day of October, 2019.

_____
HONORABLE MARIA A. AUDERO
UNITED STATES MAGISTRATE JUDGE

19

## ATTACHMENT A

<u>PREMISES TO BE SEARCHED</u>

The premises to be searched is the property located at 1224 West Martin Luther King Jr. Blvd, Los Angeles, California 90037 (the "SUBJECT PREMISES"). The SUBJECT PREMISES is a single story, single family residence. The numbers "1224" are displayed in white numbering against a brown background affixed to a wood pillar in the front of the location, directly east of the front door. The SUBJECT PREMISES has grey shingle roof, with a brown/red wood trim with white stucco exterior walls, and a brown front double door which faces north. There is a paved driveway which is on the east side of the SUBJECT PREMISES. The front of the residence has a brown wrought iron fence which restricts access to the front door and driveway.

**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.      The items to be seized are evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 846 and 841(a)(1) (conspiracy, distribution, and possession with intent to distribute controlled substances) and Title 18, United States Code, Sections 922(g) and 924(c) (felon in possession of a firearm and possession of a firearm in furtherance of drug trafficking) (the "Target Offenses"), namely:

a.      Controlled substances;

b.      Items and paraphernalia used in manufacturing, distributing, packaging, and/or weighing controlled substances, including scales and other weighing devices, plastic baggies, heat sealing devices, cutting devices, balloons, baggies, and wrapping material;

c.      Books, records, receipts, notes, correspondence, ledgers, logs, journals, and other papers noting the price, quantity, and/or times when controlled substances were obtained, manufactured, transferred, sold, distributed, and/or concealed, including but not limited to buyer lists, seller lists, sales records, pay/owe sheets, and expense records, including records written in vague or coded language;

d.      United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000);

e.      Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

f.      Records, documents, programs, applications, or materials reflecting or relating to payment, receipt, concealment, transfer, or movement of money, including bank account records and other financial institution records, wire transfer records, receipts, safe deposit box keys and records, and notes, including records written in vague or coded language;

ii

g.      Records, documents, programs, applications, or materials reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items of value;

h.      Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the trafficking of controlled substances, firearms, and ammunition, or the collection, transfer or laundering of the proceeds of illegal activities;

i.      Data, records, documents, programs, applications or materials relating to the trafficking of controlled substances, firearms, and/or ammunition, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when controlled substances, firearms, or ammunition were bought, sold, or otherwise distributed;

j.      Audio recordings, pictures, video recordings or still captured images related to the purchase, sale, transportation, or distribution of controlled substances, firearms, or ammunition, or the collection, transfer or laundering of the proceeds of illegal activities;

k.      Contents of any calendar or date book stored on any of the digital devices;

l.      Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations;

m.      Firearms and firearm-related materials, including handguns, shotguns, rifles, assault weapons, and machine guns, ammunition and magazines used to hold ammunition, silencers, components of firearms (including components or tools which can be used to modify firearms or ammunition), holsters, gun cases, and gun-cleaning kits, body armor, bulletproof vests, and records, documents, and tools used for or reflecting the ownership, manufacture, or maintenance of firearms or ammunition (including reloading devices, dies, scales, books, pamphlets, manuals, and documentation);

n.      Bills, records, and subscriber documents for cellular telephones and other digital devices;

o.      Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, hard copy correspondence, notes, photographs and videos (including items stored on digital devices);

p.      Indicia of occupancy, residency, or ownership of the SUBJECT PREMISES and items described herein, including identification cards or documents, immigration records, utility bills, telephone bills, loan payment receipts, rent receipts, deeds, lease or rental agreements, escrow documents, keys, letters, mail, canceled mail envelopes, or clothing;

q.      Documents, photographs, scrapbooks, or images associated with the Rollin' 30s gang;

r.      Posters, drawings, hats, or other apparel bearing the names, signs, or symbols of the Rollin' 30s gang;

s.      Rosters, monikers, and telephone numbers for Rollin' 30s gang members;

t.      Notes or papers containing information about discipline as to Rollin' 30s gang members, debts owed to or from Rollin' 30s gang members, and Rollin' 30s gang members who are not in good standing;

u.      Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

v.      With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.      evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

          ii.        evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

          iii.       evidence of the attachment of other devices;

          iv.       evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

          v.        evidence of the times the device was used;

          vi.       passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

          vii.       applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

          viii.    records of or information about Internet Protocol addresses used by the device;

          ix.       records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.       As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.       As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital

cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

II.   **SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.      In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.      Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location. The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant. The government will not search the digital device(s) beyond this 120-day period without first obtaining an extension of time order from the Court.

b.      The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.      The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.      The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

        iii.     The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

        c.     If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

        d.     If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

        e.     If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

        f.     If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the digital device but may not access data falling outside the scope of the items to be seized (after the time for searching the device has expired) absent further court order.

        g.     The government may retain a digital device itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the device is determined to be an instrumentality of an offense under investigation or the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending). Otherwise, the government must return the device.

h.      After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.      In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.      Any digital device capable of being used to commit, further or store evidence of the offenses listed above;

b.      Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.      Any magnetic, electronic, or optical storage device capable of storing digital data;

d.      Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.      Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.      Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.      Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device

6.      During the execution of this search warrant, the law enforcement personnel are authorized to: (1) instruct JUAN VALENCIA CONTRERAS and ESMERELDA CUEVAS to depress his and/or her thumb- and/or fingerprints onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the faces of JUAN VALENCIA CONTRERAS and ESMERELDA CUEVAS and instruct him and/or her to hold his and/or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such

device.  In executing the conditions of this paragraph, law enforcement may not use excessive force, as defined in <u>Graham v. Connor</u>, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the circumstances confronting them.

7.      The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.